UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
WALTER ELAM,

        *Plaintiff*,

        v.

CONCOURSE VILLAGE, INC., ANTHONY JAMES,
*individually, and* LETITIA BOWRY, *individually*,

        *Defendants*.
------------------------------------------------------------------------X

**15 CV 7215**

**DECLARATION OF WALTER ELAM**

Walter Elam declares under penalty of perjury:

1. My name is Walter Elam.

2. I am the Plaintiff in the above-captioned case.

3. I was hired by Concourse as a Stockroom Supervisor, a non-union position, in late 2005.

4. As a Stockroom Supervisor, my job responsibilities included ordering, maintaining, and disbursing supplies, among other things.

5. Throughout my ten (10) years of employment at Concourse, I received highly positive performance evaluations and merit-based salary raises. A true and correct copy of a letter dated April 10, 2008, notifying me of a merit-based salary raise is annexed hereto as Ex. A. A true and correct copy of a positive performance evaluation dated April 15, 2009, is annexed hereto as Ex. B. A true and correct copy of a letter dated September 15, 2014, notifying me of a merit-based salary raise is annexed hereto as Ex. C.

6. In June 2011, my wife, Monica Elam, was severely injured in a car accident.

7. As a result of her accident and a subsequent stroke, she has a number of serious physical disabilities: brain damage, speech impairment, and partial paralysis with limited movement on her right side. A true and correct copy of a letter from my wife's treatment provider dated April 11, 2016, is annexed hereto as Ex. D.

8. Due to her partial paralysis, she uses a wheelchair and is unable to walk without a cane or for more than a few feet.

9. I am my wife's primary caregiver and am responsible for her health and safety, which includes regularly taking her to doctor's appointments and feeding and bathing her.

10. During my employment at Concourse, I hired an aide to care for my wife during the day while I was at work.

11. I requested extended leave to care for my wife shortly after her 2011 accident.

12. I spoke to a manager, known only to me as "Desi," who was an employee at PRC, the property management company with whom Concourse was contracting at the time. Desi told me that I was not permitted to take the requested extended leave because Concourse "needed [me]." However, she stated that if I needed to take shorter periods of time off work to take care of my wife, I could use sick days to cover my absences.

13. Throughout my employment at Concourse, I did not know that the FMLA existed at all. I was never aware that such a law existed that entitled me to use leave to care for my wife.

14. Concourse never gave me any notice of my rights under the FMLA.

15. I never saw any poster or writing of any kind at Concourse regarding the FMLA.

16. I never learned about the FMLA from a source outside of Concourse.

17. On or about April 20, 2015, Concourse hired Anthony James as a Lead Supervisor.

18. Henry, James, Bowry, and Verney knew of my wife's disability.

19. In or around June 2015, James proposed changing the shift schedules for supervisors, requiring each of the four supervisors at Concourse to stay at the Property late, until approximately 9:00 p.m., one night per week.

20. On or about June 11, 2015, James asked me to work a late shift.

21. I told James that I was unable to work evenings, as I needed to care for my wife.

22. I believed that I was entitled under the law to my request to not work in the evenings due to my wife's disability.

2

23. James denied my request and trivialized my need to care for my wife, telling me, "This is a place of business…things don't work around your wife because she's handicapped."

24. I responded that Concourse was aware of my wife's disability and of my need for related accommodations, yet James responded, "Well, I'm in charge now."

25. I believed that, by denying my request, James had violated my rights.

26. As such, I went to Henry's office and spoke to her in person. I told her that she understood my situation as it pertained to my wife. She told me that James could not make me work evenings.

27. After I spoke with Henry, she called James into her office for a private meeting. I waited outside.

28. James left shortly after, while I was still waiting outside; he looked quite upset.

29. Henry called me back in and she told me that I was going to continue working the hours that I had been working. She told me that she spoke to James and that I should not worry about the matter anymore.

30. After this incident, however, James began to target and harass me because of my wife's disability and my role as her primary caregiver and for my complaining to the Board about his conduct.

31. On June 22, 2015, I learned that I would need to take my wife to a pre-surgical testing appointment that day in preparation for her upcoming surgery, as my wife's usual aide had unexpectedly failed to come in. A true and correct copy of a doctor's note regarding the pre-surgical testing appointment is annexed hereto as Ex. E.

32. As such, I took the morning off work to take my wife to her appointment.

33. At the first available opportunity, I called Concourse's dispatcher to inform him that I would not be at work in the morning.

34. I also called my assistant, Lillian Somersle, to inform her that I would not be at work that morning and instructed her to also notify James.

35. At the time, I did not have James's email address or phone number, or I would have notified him myself.

36. I believed that either contacting the dispatcher or Somersle independently satisfied Concourse's requirement that a Concourse employee inform Concourse when he or she was going to be late or absent.

37. Later that same day, at around 3:00 p.m. when I came to work, James wrote me up for being absent that morning, despite the fact that I had complied with Concourse's sick-leave policy and procedure and did not violate any Concourse rule. A true and correct copy of James's memorandum dated June 22, 2015, is annexed hereto as Ex. F.

38. Prior to that write-up, James had never instructed me that I needed to contact him if I was going to be absent.

39. James never told me that he had trouble finding me on the Property on any other occasion.

40. The following day, June 23, 2015, James verbally disciplined me for having taken time off on June 22, 2015, to care for my wife.

41. James told me that I was not allowed to use sick days to care for my wife.

42. Concourse's sick leave policy does, however, allow employees to take sick days to care for family members; Concourse had explicitly told me of this policy when I began working at Concourse. A true and correct copy of a memorandum dated October 5, 2006, summarizing Concourse's benefits policy is annexed hereto as Ex. G.

43. When I objected to James' statement that I could not use sick time to take care of my wife, James told me that he "didn't care" that my wife was disabled.

44. I also believed that I was entitled to use my sick time as per Concourse's sick time policy, which allows employees to use sick time to care for their own illness or injury, as well as the illness or injury of a family member.

45. On or about June 24, 2015, I asked Somersle to confirm in writing that I had called her. A true and correct copy of Somersle's confirmation is annexed hereto as Ex. H.

46. After June 22, 2016, following James's instruction and afraid of further retaliation, I stopped using sick time to care for my wife.

47. Although there were about four other occasions that I needed to go home to care for my wife, I did not go home and instead stayed at work because of James's statement that I could not use sick leave.

48. Neither James nor anyone else at Concourse informed me of the FMLA or provided me with an alternative to sick leave that would allow me to take care of my wife.

49. After I complained to Bowry, James's harassment of me intensified.

50. On Thursday, June 25, 2015, James required me to generate an inventory list by Friday, June 26, 2015, giving me one day's notice.

51. James had never previously asked me to complete an inventory list.

52. James did not provide instructions on how he wanted the list generated. A true and correct copy of James's memorandum dated June 25, 2015, is annexed hereto as Ex. I.

53. However, my work computer stopped functioning on June 25, 2015. The computer would not turn on.

54. I went to Henry's office on June 25, 2015, to inform her that the computer was not working.

55. Henry told me that should was contact an outside contractor to fix the computer.

56. I expected the computer to be fixed by Friday, giving me more than enough time to generate the inventory list.

57. I tried to get an outside contractor to fix the computer, but by Friday night, the computer was still broken.

58. As such, I attempted to create the inventory list by hand.

59. I gave the handwritten list to James on Friday, June 26, 2015.

60. On Monday, June 29, 2015, James told me that I "did not do the list correctly" because it was not typed.

5

61. James told me to re-do the list. A true and correct copy of James's memorandum dated June 29, 2015, is annexed hereto as Ex. J. A true and correct copy of my response to James's June 29, 2015 memorandum is annexed hereto as Ex. K.

62. I redid the list at home on my home computer and delivered the revised list to James on Tuesday, June 30, 2015.

63. James again rejected the list, claiming that it was due on Monday, June 29, 2015.

64. James never told me by when the revised inventory list was due.

65. James then suspended me for three (3) days without pay. A true and correct copy of the Disciplinary Notice Form dated June 30, 2015, is annexed hereto as Ex. L.

66. On July 1, 2015, I sent a letter to the Board members, requesting a meeting to discuss James' ongoing harassment.

67. Constance Walker Hendricks, a Concourse Board member, told me that the Board had calendared me for a meeting on July 9.

68. On July 2, 2015, I complained to Christina Verney—a human resources ("HR") coordinator at Winn Management, with which Concourse contracted to provide a variety of functions, including HR—about James' continuing, improper harassment based on my wife's disability, filing a harassment complaint against him. I included, among other things, James's memorandum and a doctor's note from when I was absent.

69. Verney told me she spoke to Henry and that James was not authorized to take disciplinary action against me, that I would receive pay for the days I had been suspended, and that the disciplinary action form would be removed from my personnel file.

70. On July 6, 2015, I returned to work.

71. Around this time, I learned that there was a letter circulating among Board members from Bowry about me. I asked Hendricks, about the letter. She gave me a copy of it. A true and correct copy of Bowry's letter dated June 26, 2015, is annexed hereto as Ex. M.

72. In the memorandum, Bowry mocked my wife's disability and my circumstances, sarcastically stating: "As a Supervisor, you said you cannot work at nights because you have a

sick wife but somehow you were able to be on CV [Concourse] premises looking to find Mr. James in wrongdoings and putting letters under Shareholders' door. Who was looking after your wife, Mr. Elam? I pray she is well with you being at CV last night." *See* Ex. M.

73. On July 9, 2015, the Board held a meeting.

74. I waited outside the meeting for two to three hours. Around 10:00 p.m., however, a Board member told me that the Board did not have time to address the issues that I raised.

75. After the meeting, Leroy Meyers, a Concourse Board member, told me that Bowry was trying to get me fired during the meeting. Meyers also told me that that the Board members told Bowry that she could not fire me. Instead, the Board instructed Bowry to have a meeting between James and me to address the issues.

76. On July 10, 2015, Meyers told me that Henry would call James and me for a meeting. Meyers told me that he did not want me to go into the meeting by myself and to call him when I was called for the meeting. That meeting did not occur.

77. On July 13, 2015, the management office called me saying that Henry wanted to speak with me. I called Meyers informing him of the meeting.

78. Meyers and I walked into the management office. Bowry, James, and two other Board members, Michael Chavis and Frances Stanley, were there.

79. In this meeting, Bowry handed me a termination letter and informed me that Concourse was terminating my employment. A true and correct copy of the termination letter is annexed hereto as Ex. N.

80. Meyers repeatedly protested that Bowry did not have the authority to terminate me, as the Board had not agreed to terminate me, but to no avail.

81. Bowry never notified me of any performance deficiencies prior to my termination, nor was I ever reprimanded for insubordination.

82. The actual reason for my termination was my need to take leave to assist my wife, and my complaining about James's actions against me.

83. I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      October 14, 2016

By: _____
      Walter Elam