# In The Matter Of:

*WALTER ELAM v.*
*CONCOURSE VILLAGE, INC.*

---

*LETITIA BOWRY*
*May 25, 2016*

---

*Cindy Afanador*

COURT REPORTING, INC.

Conference Suites
MANHATTAN ‑‑BRONX ‑‑BROOKLYN ‑QUEENS
GARDEN CITY ‑‑MELVILLE ‑‑HAUPPAUGE ‑RIVERHEAD

HTTP://WWW.CINDYCOURTREPORTING.COM
**1-877-337-6968**

*Original File FINAL Letitia Bowry_052516.txt*
*Min-U-Script® with Word Index*

20

1                     L. BOWRY
2          Q.     So I'll ask again, have you
3      seen this document before?
4          A.     Yes.
5          Q.     When did you see it?
6          A.     (No audible answer.)
7          Q.     I'm sorry.  Can you answer the
8      question without looking at it?
9          A.     Okay.  I think it was in --
10     between April and May.
11         Q.     Of what year?
12         A.     2016.
13         Q.     I'm directing your attention to
14     page ten of the document.  Is that your
15     signature?
16         A.     Yes.
17         Q.     Did you provide the answers
18     that were contained in this document?
19         A.     Yes.
20         Q.     And when you provided those
21     answers were they true and correct?
22         A.     Yes.
23         Q.     Did you read any witness
24     statements before the deposition?
25         A.     No.

36

1                        L. BOWRY
2    They said you are the best president that
3    Concourse Village ever had, we need your
4    help, don't you see we're going down.
5            Q.    They missed you?
6            A.    And I told them -- I said, no.
7            Q.    What were some of the
8    complaints that the shareholders were
9    bringing you?
10           A.    The floors were dirty, the
11   grounds were dirty.  We have people that
12   are walking in our buildings, don't have
13   the keys, don't live here, situation like
14   that.
15           Q.    And by people walking in
16   without keys, are you referring to
17   strangers?
18           A.    Yes.
19           Q.    Non-residents?
20           A.    Non-residents.
21           Q.    Non-employees?
22           A.    Non-employees.
23           Q.    Just some people off the
24   street?
25           A.    Know people in the building and

43

```
 1                    L. BOWRY
 2        A.    Yes, maintenance also.
 3        Q.    Both maintenance?
 4        A.    Yes.
 5        Q.    And to whom do they report?
 6        A.    They report to Mr. James.
 7        Q.    Does anybody else report to
 8   Mr. James directly?
 9        A.    I would like to say maintenance
10   men.
11        Q.    The maintenance men you're
12   referring to are those who are under Calvin
13   Reed?
14        A.    Under both of them, Calvin and
15   Mr. Walter.
16        Q.    And Walter?
17        A.    Yes.
18        Q.    Is there a current stockroom
19   supervisor?
20        A.    Yes, well, he's a stockroom
21   clerk, not a supervisor.
22        Q.    So the title is a stockroom
23   clerk?
24        A.    Yes.
25        Q.    Where does the stockroom clerk
```

44

1                      L. BOWRY

2    work?

3         A.    Where does he work, inside the

4    stockroom.

5         Q.    Does anybody else work inside

6    the stockroom?

7         A.    No, not as far as I know.

8         Q.    And who is the current

9    stockroom clerk?

10        A.    I can't remember his name.

11        Q.    Okay.

12        A.    And I know him.

13        Q.    It happens.

14              In your thirty years at

15   concourse has the stockroom clerk ever had

16   another title?

17        A.    The only thing that I know um,

18   supervisor, supervisor.

19        Q.    The stockroom clerk was once

20   the supervisor?

21        A.    Yes.

22        Q.    When did that title change?

23        A.    When that title change -- I

24   think when he was terminated.

25        Q.    He, you mean Walter Elam?

48

1                      L. BOWRY
2    regulations written anywhere?
3          A.    I am not certain.
4          Q.    Have you ever seen them?
5          A.    I am not certain that I have.
6          Q.    Do these rules cover
7    performance guidelines?
8          A.    I would like to think so due to
9    management have pointed out men to me that
10   he thought was very well in that capacity
11   of, you know, maybe getting an increase or
12   something of that sort because their
13   performance was good.
14         Q.    But you never have seen any
15   written document of Concourse performance
16   policies?
17         A.    I can't remember that I ever
18   saw one, no.
19         Q.    Okay.  What about sick leave
20   policy, are those written anywhere?
21         A.    I'm quite certain there is, but
22   I'm not privy to that.  I was not privy to
23   that and I don't know anything about that.
24         Q.    What do you mean when you say
25   that you were not privy to Concourse's sick

50

1                    L. BOWRY
2        A.    No.
3        Q.    How about discrimination
4   policy?
5        A.    Oh, no.  We don't do that
6   there.
7        Q.    You don't have a discrimination
8   policy?
9        A.    I'm quite certain they probably
10  have, but, you know, I'm not aware of that.
11       Q.    You've never seen it before?
12       A.    I've never seen it, no.
13       Q.    And like the sick leave and the
14  performance policy, it wouldn't be
15  something that you would look for?
16       A.    No.
17       Q.    What about medical leave
18  policy?
19       A.    No, the only medical leave --
20  medical policy that I was involved in as a
21  board president was Calvin Reed to renew
22  his health coverage.  That's it.
23       Q.    Okay.  Is there an employee
24  handbook?  Are you familiar with that
25  concept?

54

1                     L. BOWRY

2        A.     They were the management agent.

3        Q.     The management agent?

4        A.     Yes.

5        Q.     How long have they been the

6   management agent?

7        A.     Before I got on the board, I

8   say, approximately, three to four years.

9        Q.     Do you know who the management

10   agent was before that?

11        A.     I know the manager, Ms. Des,

12   but I can't remember the company's name.

13        Q.     Okay.

14        A.     But that was before I got on

15   the board.

16        Q.     And are you -- did you say

17   that Inn Companies won't be the managing

18   agent sometime soon?

19        A.     Yes, yes.

20        Q.     Why is that?

21        A.     Their performance was not up to

22   par for what we expect at Concourse

23   Village.

24        Q.     What did they do wrong?

25        A.     What they didn't do wrong?

55

1                    L. BOWRY
2          Q.     What would be the easier way
3    for you to answer that?
4          A.     A lot of things that was not
5    right that, you know, that we have spoken
6    about -- that, you know, we had expected
7    better and it was not done --
8          Q.     Who should have done a better
9    job?
10         A.     Inn should have done a better
11   job for the corporation.
12         Q.     Any employees in particular?
13         A.     No, just Inn should have put
14   down their laws to the employees that work
15   in Concourse Village and say what they
16   expect and what they didn't expect.
17         Q.     So you can't identify a
18   particular Inn employee who made mistakes?
19         A.     No.
20         Q.     Did She rill Henry make any
21   mistakes?
22         A.     Well, you know we all do make
23   mistakes but Ms. Henry was good.  Ms. Henry
24   was a good employee.
25         Q.     For the sake of this

56

1                     L. BOWRY

2    conversation, when I say "make mistakes"

3    I'm just referring to performance not being

4    up to par?

5         A.    No, her performance was up to

6    par.

7         Q.    And Len Jones, was his

8    performance up to par?

9         A.    Oh, yes, he's up to par.

10        Q.    So, again, you can't identify

11   an individual at Inn who wasn't up to par,

12   just Inn as a company wasn't up to par?

13        A.    Just Inn as a company.

14        Q.    Okay.  So I know there's a lot.

15   But can you give me an example of something

16   that they weren't up to par with?

17        A.    Example?  We are supposed to

18   have six and-a-half individuals working in

19   the management office.  At times it was

20   only three, three and-a-half, sometimes

21   four.

22        Q.    Am I understanding --

23        A.    So we had --

24        Q.    -- that you're paying for six

25   but getting three?

57

1                    L. BOWRY

2        A.    So we had a skeleton crew for

3    over a year and paying every month the full

4    amount.  And when I point that out to them,

5    I say I can't do this.

6        Q.    You're paying for flesh and

7    blood and getting bones?

8        A.    That's right.  That's right.

9    We're not doing business like this.

10        Q.    What other problems did Inn

11    have?

12        A.    Well, that was -- that was --

13    and again, Concourse Village paid Inn to

14    advertise to get people in here to work.

15    Inn would take the money, advertise, get

16    people to work, and then move these

17    individuals after a couple of months to

18    another site without replacing them in

19    Concourse Village.

20        Q.    Why was that a problem?

21        A.    It's a problem because you

22    can't just take people from there and don't

23    replace them.  We don't have enough people

24    to work with.

25        Q.    Okay.  Were there any other

66

1                    L. BOWRY

2          A.      Well, when people make

3    complaints, I think it's my responsibility

4    to check it out to see if what they're

5    saying is true or not true.  So I visit the

6    areas.  So I am familiar with the entire

7    Concourse Village and the buildings.

8          Q.      Could you describe the

9    maintenance office for me?

10         A.      When you come into the door,

11   the foyer -- you would find the foyer.  You

12   would find the men's card to clock in.

13   Then you would find a clock there.  I'm

14   made to understand they just got that where

15   it is a face recognition.  And then on that

16   side, it's --  you look inside and you see

17   the two dispatchers sitting there.  And you

18   come in -- when you come into the

19   dispatchers area, just behind the

20   dispatchers area is the director's office.

21         Q.      Have you ever seen anything

22   related to the Family and Medical Leave Act

23   in the maintenance office?

24         A.      No.

25         Q.      You've never seen --

67

1                    L. BOWRY

2          A.     No.

3          Q.     Any flyers?

4          A.     No.

5          Q.     Any posters?

6          A.     No.

7          Q.     Letters?

8          A.     No.

9          Q.     Anything related to the Fair

10    Labor Standards Act?

11         A.     No.

12         Q.     No posters?

13         A.     No.

14         Q.     Do you know where an employee

15    would find out information related to the

16    Family Medical Leave Act?

17         A.     I think they would go to

18    management or call Inn because that's the

19    HR.   That's what I think.   But that's it.

20         Q.     Do you know if Concourse

21    Village employees were trained to contact

22    Inn if they had any issues regarding FMLA?

23         A.     I don't know.

24         Q.     Did you ever direct any

25    Concourse Village employees to provide, you

68

1                    L. BOWRY
2   know, information on how they can find out,
3   information?
4        A.    No, no.
5        Q.    Do you know if James had done
6   that on his own?
7        A.    I'm not sure.
8        Q.    Do you know if any Concourse
9   Village employees does that on their own?
10       A.    No.
11       Q.    Do you know if Inn provides
12  the training?
13       A.    If Inn provides --
14       Q.    Provides any training on FMLA?
15       A.    I'm not sure.  I don't know.  I
16  don't know.
17       Q.    Do you know what Inn does?
18             MS. MUNSKY:  Objection to form.
19       A.    Um.
20             MS. MUNSKY:  You can answer if
21        you understand the question.
22       A.    I know they manage or they seem
23  to manage -- or the title that they got is
24  to manage, but that's it.
25       Q.    So you know them -- strike

79

1                    L. BOWRY

2    correct?

3         A.    They're in the same building

4    and the stockroom is off by itself, yes.

5         Q.    Who did Walter Elam report to

6    before Mr. James?

7         A.    She rill Henry.

8         Q.    And who did Calvin Reed report

9    to before Mr. James?

10        A.    She rill Henry.

11        Q.    And Walter Cory?

12        A.    They all report to She rill

13   Henry.

14        Q.    Moore too?

15        A.    Yes.

16        Q.    Who directed James to supervise

17   Walter Elam?

18        A.    She rill Henry.

19        Q.    And how do you know that?

20        A.    Because Ms. Henry told me that

21   she is no longer supervising any

22   maintenance individual.  Mr. James is here

23   to take that burden, that's what she said.

24        Q.    So she told you that she's no

25   longer supervising maintenance individuals?

81

1                    L. BOWRY

2    question or She rill Henry.  I don't know.

3         Q.    So what is the basis for you

4    believing that the stockroom supervisor was

5    under maintenance?

6         A.    Because when he reports to

7    Ms.  Henry, Ms. Henry told him, you no

8    longer report to me, you have to report to

9    Mr. James.

10        Q.    Were you there at that

11   conversation?

12        A.    No, but this is what Ms. Henry

13   said.

14        Q.    Ms. Henry told you that?

15        A.    Yes.

16        Q.    When was it Ms. Henry told you

17   that?

18        A.    A while back.  I can't remember

19   the date.

20        Q.    Was it around the time that

21   Mr. James was hired?

22        A.    Could have been, yes.

23        Q.    Was it after he was hired?

24        A.    Yes, it has to be after.

25        Q.    And what was the

82

1                    L. BOWRY

2    responsibilities of the stockroom

3    supervisor?

4         A.    That I -- I don't know.  I

5    just know he was in the stockroom and he do

6    what he supposed to do.  That's it.  I

7    don't know.

8         Q.    So you don't know what his

9    duties are?

10        A.    No.

11        Q.    Do you know what he was

12   supposed to do?

13        A.    I know he was supposed to take

14   instructions from the maintenance director.

15        Q.    From Mr. James?

16        A.    Yes, Mr. James in order to run

17   that stockroom in a professional way.

18   That's all I can say.

19        Q.    But besides that, you don't

20   know what he was responsible for?

21        A.    No.

22        Q.    Before April 20, 2015 did you

23   receive any complaints about Walter Elam?

24        A.    Um, no --  no.

25        Q.    Did you ever receive any

83

1                        L. BOWRY

2    complaints about Walter Elam?

3         A.    Um, yes.

4         Q.    When was the first time?

5         A.    I don't know.

6         Q.    Well, you know it was after

7    April 20, 2015, correct?

8         A.    No, I don't.  No.

9         Q.    Well, you testified that you

10   hadn't before April 20, 2015.  But you also

11   testified that you've heard a complaint so

12   it had to be after April 20, 2015?

13        A.    That I what?  What did you say?

14   That I what?

15        Q.    You just testified that you

16   hadn't received any complaint prior to

17   April 20, 2015, correct?

18        A.    Hmm hmm, yes.

19        Q.    But you also testified that you

20   had received complaints about him, correct?

21        A.    I've testified that I have had

22   a plaintiff?

23        Q.    That you had received

24   complaints about Walter Elam?

25        A.    No, I never received any

84

```
1                     L. BOWRY
2    complaints about Walter Elam.
3         Q.    Nobody ever complained to you
4    that he wasn't doing a good job?
5         A.    Yes, but way after April 20th.
6         Q.    Okay.  That was my question.
7         A.    Okay.
8         Q.    Whether you received it after
9    April 20, 2015, which you answered yes,
10   correct?
11        A.    Yes.
12        Q.    But you don't remember
13   precisely when you first received the
14   complaint?
15        A.    No.
16        Q.    It was in 2015, correct?
17        A.    Hmm hmm.
18        Q.    Was it between May and June
19   2015?
20        A.    I'm not certain about --
21        Q.    You're not certain?
22        A.    I'm not certain.
23        Q.    Was it the spring or summer of
24   2015?
25        A.    It could have been in the
```

85

1                    L. BOWRY

2    summer.

3         Q.    It could have been in the

4    summer?

5         A.    Yes, could have been.

6         Q.    And who complained to you?

7         A.    Maintenance men.

8         Q.    Which?

9         A.    Maintenance men in Concourse

10   Village.

11        Q.    Specific names?

12        A.    I don't remember who it is that

13   complained to me, but they did complain.

14        Q.    Okay.  So maintenance men not

15   Moore?

16        A.    No, I mean the workers the

17   handymen or the --

18        Q.    Not supervisors?

19        A.    No.

20        Q.    So supervisors didn't complain

21   to you, but a maintenance person did?

22        A.    Yes.

23        Q.    Did James ever complain to you

24   about Walter Elam?

25        A.    Yes.

1                    L. BOWRY

2  to do in order to fire a supervisor?

3        A.    He has to have meetings with

4  him.

5        Q.    Okay.

6        A.    He has to write up papers on

7  him to prove that he have spoken with him

8  on these occasions.  And after three

9  warnings and write-ups, he has a right to

10 terminate them.

11       Q.    So after three written

12 warnings?

13       A.    Yes.

14       Q.    He would have the right to

15 terminate?

16       A.    Yes.

17       Q.    Can he terminate the person

18 independently or does he need to ask the

19 board?

20       A.    No, he does not need to ask the

21 board if he can do termination.  He can do

22 the termination; however, he must let the

23 board know what he has done.

24       Q.    So he just needs to inform the

25 board.  That's his only obligation?

95

1                    L. BOWRY

2        A.    Yes.

3        Q.    Was it Anthony James that fired

4    Walter Elam?

5        A.    No, it was She rill Henry,

6    myself, and about a couple of board

7    members.

8        Q.    Okay.  So what was the --

9    strike that.

10            Was your involvement in the

11   decision by virtue of you being the

12   president of the board?

13       A.    Yes.

14       Q.    Did you vote?

15       A.    Vote to what?

16       Q.    Terminate him.

17       A.    No.

18       Q.    Was there a vote?

19       A.    No, there wasn't a vote.

20       Q.    So could you tell me what

21   happened?

22       A.    I got a --  we have a lot of

23   complaints about Walter Elam not taking

24   instructions.  And when he's asked to

25   report to Mr. James, he would say that he

98

                         L. BOWRY

1

2        A.     Mr. James.

3        Q.     And what did he say?

4        A.     He said that he would not take

5    instructions.  He would not listen to me.

6    He comes in when he wants to come in.  He

7    leaves when he wants to leave.  He said, he

8    is going to pick up merchandise and he come

9    back with his empty hands with nothing.

10       Q.     Did he say the words, and so he

11   should be fired?

12       A.     Mr. James said if he cannot

13   take instructions, then it's pointless to

14   have him here.

15       Q.     Who spoke next?

16       A.     I did.

17       Q.     And what did you say?

18       A.     I told him --  no, it wasn't

19   me.  It was She rill Henry that spoke next.

20   Ms. Henry told him that, you know, I asked

21   you to report to Mr. James.  I asked you to

22   do certain things with Mr. James and you

23   refuse.  And this is the consequences of

24   what happen.

25       Q.     I'm sorry.  Was Walter at that

110

1                          L. BOWRY
2     director for them to sit down and see what
3     it is.
4          Q.    So it's the director who
5     ultimately decides what's ordered?
6          A.    Yes.
7          Q.    And the director, you mean the
8     lead supervisor?
9          A.    Yes.
10         Q.    That was Anthony James?
11         A.    Yes.
12         Q.    And Anthony James became the
13    director after he was lead supervisor?
14         A.    Yes.
15         Q.    And Calvin Read, what did he
16    complain about?
17         A.    That every time he goes to the
18    stockroom and we ask for things we didn't
19    have it.  And we have millions of dollars
20    in the stockroom and we didn't have it.
21         Q.    Is it that the stockroom didn't
22    have it or that he couldn't find it?
23         A.    I don't know.  That I don't
24    know, sir.
25         Q.    What did you do with this

112

                            L. BOWRY
1
2     were the performance objectives?
3          A.     He was told to give an
4     inventory sheet of everything that is in
5     there.  He was told to label on the wall
6     what he has in front of each area and he
7     refused.  He gave about six to eight pieces
8     of information that he written and was not
9     professional enough from a stockroom.
10         Q.     Is it, in your opinion, that it
11    wasn't professional enough or is there a
12    written policy?
13         A.     No, it is my opinion it wasn't
14    professional because I did stockroom clerk
15    for a liquor store.  I know what to put
16    down, everything to put down, and then
17    label it, and turn it over the way it's
18    supposed to be done.
19         Q.     So my question is, is it your
20    opinion that it wasn't professional or is
21    it violating some policy at Concourse?
22         A.     No, it was Mr. James and
23    Ms. Henry's --
24         Q.     Opinion?
25         A.     Opinion that this was not

113

1                    L. BOWRY
2    professional.
3         Q.    And what made it not
4    professional?
5         A.    Because, like I said, we have a
6    whole lot of things in the stockroom, how
7    can you only put down eight items and write
8    it in pen.
9         Q.    Was that it, that it was
10   written in pen part of the problem?
11        A.    I would like to think so, yes.
12        Q.    So it was written in pen.  That
13   was part of the problem, that there were
14   eight things and there were more than that
15   in the stockroom was part of the problem?
16   Was there any other problem with the
17   inventory sheet that Elam provided?
18        A.    That wasn't an inventory sheet
19   that was a piece of paper that was pull out
20   and write some stuff on it.
21        Q.    So that wasn't even an
22   inventory sheet in your opinion?
23        A.    That wasn't an inventory sheet.
24        Q.    It was an attempt in making an
25   inventory sheet, right?

114

1                    L. BOWRY

2          A.    Ms. Henry said if you don't

3    understand come and we'll sit with you and

4    tell you.   He decide that no.

5          Q.    Did he decide no in front of

6    you?

7          A.    No, I'm just saying he decide

8    no, because he did not go to Ms. Henry, he

9    did not go to Mr. James.

10         Q.    And how do you know that?

11         A.    He just complained to others,

12   other shareholders on the plaza, which I'm

13   aware of because they have come to me and

14   tell me.

15         Q.    How do you know that he didn't

16   go to Henry or James in order to find out?

17         A.    Because Ms. Henry said he never

18   came to her.

19         Q.    Was there anything else

20   concerning performance objectives that he

21   hadn't obtained?

22         A.    It was not up to par.

23         Q.    With respect to the inventory

24   sheet, we covered that.   Was there anything

25   else?

117

1                          L. BOWRY

2      would hear complaints regularly from

3      maintenance men?

4           A.    I would hear complaints from

5      them.  And I would advise them to go see

6      Ms. Henry.

7           Q.    Did you ever learn of Walter

8      being suspended?

9           A.    I think I heard something about

10     suspension, but I'm not too sure.

11          Q.    What did you hear?

12          A.    I think I hear that he was

13     suspended, but I'm not too sure.

14          Q.    Who did you hear it from?

15          A.    I think it's Ms. Henry.

16          Q.    Ms. Henry told you that he was

17     suspended?

18          A.    I think he was suspended before

19     I got on the board so, you know, when all

20     this thing came up, about, you know, the

21     stockroom, that's when she told me that --

22     you know, I think she told me that, you

23     know, he was suspended at one time.

24          Q.    What was your official start

25     date on the board?

118

1                    L. BOWRY

2        A.    Me?

3        Q.    Yes.

4        A.    January 2015.

5        Q.    So you don't know anything

6   about a June 30, 2015 suspension?

7        A.    No.

8        Q.    No?

9        A.    No.

10       Q.    Nothing about Walter Elam being

11   suspended around the end of June 2015?

12       A.    No, I heard about it, you know,

13   but I just did not -- I went along.

14       Q.    So you did hear about it?

15       A.    I did hear that he was

16   suspended or supposed to be suspended, but

17   that's all I heard.  I never asked why,

18   where, when.  I didn't ask those questions.

19            MR. RIVERA:  Can you mark this,

20        please as 6.

21            (Whereupon, the aforementioned

22        document was marked as Bowry Exhibit

23        6 for identification as of this date

24        by the Reporter.)

25       Q.    I'm passing the witness a