# ORIGINAL

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  -------------------------------------X

5  WALTER ELAM,

6

7                              Plaintiff,

8            - against-            15 Civ. 7215 (CM)

9  CONCOURSE VILLAGE, INC., ANTHONY

10  JAMES, individually, AND LETITIA BOWRY,

11  Individually,

12                              Defendants.

13  -------------------------------------X

14

15                      April 6, 2016

16                      10:23 a.m.

17

18            Deposition of Plaintiff WALTER ELAM,

19        held at the offices of Clifton Budd &

20        DeMaria LLP, 350 Fifth Avenue, New York,

21        New York, pursuant to Notice, before NANCY

22        SORENSEN, a Notary Public of the State of

23        New York.

24

25

Page 2

1

2   A P P E A R A N C E S:

3

4         THE HARMAN FIRM, LLP

5         Attorneys for Plaintiff

6               220 5th Avenue, Suite 900

7               New York, New York  10001

8         BY:   EDGAR M. RIVERA, ESQ.

9

10        CLIFTON BUDD & DEMARIA, LLP

11        Attorneys for Defendants

12              The Empire State Building

13              350 Fifth Avenue,

14              New York, New York  10118

15        BY:   STEFANIE R. MUNSKY, ESQ.

16                  - and -

17              CARLA B. GUNTHER, ESQ.

18

19

20

21   ALSO PRESENT:

22

23              ANTHONY JAMES

24

25

1                      W. Elam

2        A.     I don't.  Mr. Myers was there, I

3   believe Ms. Suzio (phonetic) was there.  I don't

4   remember everybody else.

5        Q.     Do you recall interviewing with

6   Ms. Bowry prior to your employment at Concourse?

7        A.     Ms. Bowry wasn't there.

8        Q.     Who hired you for your position at

9   Concourse Village?

10       A.     The board.

11       Q.     Taking a step back, since we're

12  asking questions about it, do you know what

13  Concourse Village, Inc. is?

14       A.     What do you mean?

15       Q.     Is Concourse Village an apartment

16  complex, condo, a co-op?

17       A.     It's a co-op, a Mitchell Lama.

18       Q.     I'm sorry, what?

19       A.     Mitchell Lama Co-Op.

20       Q.     Do you know how large the property

21  is?

22       A.     What do you mean by how large it is?

23  Do I know how many building they have, yes.

24       Q.     Sure, how many buildings?

25       A.     Six.

1                         W. Elam

2        Q.     Do you know how many apartment units

3     it has?

4        A.     About 1,280, I believe.

5        Q.     Do you know how many employees in

6     June 2015 Concourse Village employed?

7        A.     A little over 50.

8        Q.     When did you start your employment at

9     Concourse Village?

10       A.     2005.

11       Q.     Do you recall what month?

12       A.     No.

13       Q.     Do you recall what title you were

14    hired for?

15       A.     Stockroom supervisor.

16       Q.     In 2005, what were your

17    responsibilities for the position?

18       A.     I was in charge of ordering supplies,

19    maintaining the supplies, disbursing the

20    supplies.  A few other things I don't quite

21    remember right now.

22       Q.     Did you maintain the same title at

23    Concourse between sometime in 2005 and when your

24    employment ended in July 2015?

25       A.     Yes.

Page 50

1                        W. Elam

2         Q.    What was your work schedule when you

3    were hired in 2005?

4         A.    Eight to 4.

5         Q.    Did your schedule ever change between

6    when you were hired in 2005 and when your

7    employment ended in July 2015?

8         A.    It changed from 9 to 5.

9         Q.    Do you recall when?

10        A.    No, not really.

11        Q.    Was it a year before your employment

12   ended?

13        A.    Probably like -- it could have been

14   two years.

15        Q.    Do you know why the schedules

16   changed?

17        A.    It changed because -- I don't recall

18   right now.

19        Q.    Was it at your request or --

20             MS. MUNSKY:  Actually, strike that.

21        Q.    Was it at your request that the

22   schedules changed?

23        A.    Don't recall right now.

24        Q.    And in 2005 when you first started

25   working at Concourse Village, was there a

Page 52

W. Elam

1

2      A.    I was -- I was taught to do the

3  computer more.

4      Q.    I'm sorry, taught to do what?

5      A.    I was taught to do the computer, take

6  some classes they was giving, training classes.

7      Q.    How else did your responsibilities

8  change?

9      A.    I believe that's it that I can recall

10  right now.

11      Q.    When you first started in 2005 at

12  Concourse Village, who was your supervisor?

13      A.    Mr. Jones.

14      Q.    Do you know what his title was?

15      A.    Manager.  He's on that paper you have

16  over there.

17      Q.    Oh, the one underneath my folder?

18  I'll be showing you that shortly.

19          For approximately how many years did

20  Mr. Jones supervise you?

21      A.    Don't recall.  Two years, could be,

22  I'm not sure.

23      Q.    After Mr. Jones, who was your

24  supervisor?

25      A.    Maybe Desi.

Page 55

W. Elam

1

2     A.     Management was Desi -- I think

3  Ms. Henry was the manager.

4     Q.     So after Desi, Ms. Henry was -- and

5  was Ms. Henry your direct supervisor?

6     A.     Yes.  She was -- yes, she was my

7  direct supervisor, but I used to take my -- but

8  the director used to tell me what to do.

9     Q.     Was the director in a chain of

10  command, was Ms. Henry above the director or

11  below the director?

12     A.     Yes, she was above the director.

13     Q.     So it would be accurate to say that

14  the director could supervise your work?

15     A.     Yes.

16     Q.     After Ms. Henry, did you have -- who

17  was your direct supervisor?

18     A.     It was Ms. Henry.  I had a few -- no,

19  because we had a few directors.  So when the

20  directors came, it was Ms. Williams was a -- she

21  was one.

22     Q.     Who else were the directors?

23     A.     I don't know.  I had eight or nine of

24  them.

25     Q.     You don't recall any of the other

```
 1                      W.  Elam
 2              MS.  MUNSKY:   I mean, sorry, strike
 3       that.
 4         Q.     Who was your direct supervisor in
 5   July 2015?
 6         A.     Ms. Henry.
 7         Q.     Who is Anthony James?
 8         A.     Supervisor.
 9         Q.     Would it be accurate to say that he
10   was your supervisor in July 2015?
11         A.     No.
12         Q.     What was his title?
13         A.     Supervisor.
14         Q.     Did he have a longer title?
15         A.     Lead supervisor.
16         Q.     Was it of any particular aspect of
17   the property?
18         A.     What do you mean by that?
19         Q.     Was he the lead supervisor of the
20   stockroom, was he the lead supervisor of
21   maintenance?  I don't know, if you know his
22   exact title?
23         A.     I believe it was lead supervisor of,
24   I guess, maintenance, of the maintenance guys.
25   We had quite a few lead supervisors before,
```

1                         W. Elam

2       A.    Yes.

3       Q.    Now in March 2009 --

4             MS. MUNSKY:  Actually, strike that.

5       Q.    Is this your signature at the bottom?

6       A.    Yes.

7       Q.    And that date March 13, 2009, would

8    it be accurate to say that's when you created

9    and signed this document?

10      A.    Yes.

11      Q.    So in March 2009, what was your

12   method of keeping an adequate level of supplies

13   in the stockroom inventory at all times?

14      A.    I was using Yardi.  I was making -- I

15   had to make a spreadsheet of all inventory, and

16   I would give it to the director, whoever the

17   director was, every six months.

18            And then I kept track of everything

19   by -- any time anything came out of the

20   stockroom, we had to make -- get -- I had to --

21   well, they had to get it from the dispatch,

22   which came from whoever is the supervisor or the

23   director, and we would keep track of it by -- by

24   the request forms, invoices.

25      Q.    So you testified that you would

Page 80

1                        W. Elam

2        Q.      Was this always your responsibility

3    as a stockroom supervisor?

4        A.      Yes.

5        Q.      Then "Pick up supplies, orders,

6    directly from vendors if needed."

7                Was that always part of your

8    responsibilities?

9        A.      Yes.

10       Q.      "Conduct a yearly inventory of the

11   stockroom supplies and equipment."

12       A.      Yes.

13       Q.      Was this always your responsibility?

14       A.      Yes.

15       Q.      And "Order and distribute uniforms

16   for all Concourse Village maintenance staff" --

17       A.      Yes.

18       Q.      -- was this always your

19   responsibility?

20       A.      Yes.

21       Q.      Okay, now other than the eight things

22   that I've just identified, actually, it's

23   probably more than eight, but you've identified

24   them as eight, were there any other

25   responsibilities between March 2009 and July

Page 112

1                              W. Elam

2        Q.      During this training, was there

3    anything discussed about completing inventory

4    spreadsheets?

5        A.      No.

6        Q.      If you look at the bottom of -- it's

7    actually the document marked D 000253 --

8        A.      Yes.

9        Q.      -- it says, "Step 3, completing the

10   monthly inventory"; correct?

11       A.      Yes.

12       Q.      Was how to complete a monthly

13   inventory discussed during your inventory

14   training?

15       A.      No.

16       Q.      Again, looking at the first page in

17   the e-mail from Tyrone to you, Tyrone, who is

18   Ms. Henry's boss.

19              In the second sentence it says,

20   "Please sprint" -- maybe it means print -- "and

21   review the attached for our first training which

22   we be later this month?"

23       A.      Okay, what are you reading?

24       Q.      I'm looking at the first in this

25   e-mail.  It says, "Walter, we are going to have

1                          W. Elam

2    inventory training, there was no discussion

3    about how to maintain inventory spreadsheets?

4         A.    No.

5         Q.    Now in September 2013, how were you

6    maintaining the lists of the materials and

7    inventory in your stockroom?

8         A.    I don't understand what you mean.

9         Q.    In September 2013, what was the

10   method that you used to identify what items were

11   in the stockroom and what items were needed in

12   the stockroom?

13        A.    We had like the same thing I was

14   using like the spreadsheet from the computer of

15   the list of things we have and which would tell

16   me once it got low, to reorder that same thing.

17        Q.    Now in September 2013, did you keep a

18   master spreadsheet of all the inventory in the

19   stockroom and how many items you had of each

20   type?

21        A.    Yes.

22        Q.    How frequently would you update that

23   report?

24        A.    Every six months.

25        Q.    So it would be accurate to say that

1                          W. Elam

2          A.     The type of supply and the name, like

3     washers, waste pipes, stuff like that.  Like put

4     like a note on it like stickers and stuff.

5          Q.     So she wanted you to go around the

6     actual stockroom and label the materials?

7          A.     Yes.

8          Q.     Was there any discussion about your

9     inventory tracking system during this

10    evaluation?

11         A.     No.

12         Q.     If you look at the next sentence, it

13    starts at the bottom of the page and goes to the

14    second page.

15              It says, "One of my main concerns is

16    that Mr. Elam must advise management when he has

17    to rush to his home to take care of emergency

18    situations."

19         A.     Yes.

20         Q.     So was anything discussed during your

21    meeting with Ms. Henry about this issue?

22         A.     No.  She asked me because it was --

23    it was an incident.  Sometimes my wife --

24    Ms. Henry wasn't there.

25              So I had told -- I had told the

1                         W. Elam

2       A.     Yes.

3       Q.     It concerns your request for an

4    increase in salary; correct?

5       A.     Yes.

6       Q.     Did you receive an increase in salary

7    in or about September 2014 from Concourse

8    Village?

9       A.     Yes.

10      Q.     Do you recall what that increase was?

11      A.     It was a merit raise, I believe.

12      Q.     Do you recall what the amount of that

13   increase was?

14      A.     No.

15             MS. MUNSKY:  Off the record for 2

16       minutes.

17             (Luncheon recess:  1:08 p.m.)

18

19

20

21

22

23

24

25

Page 146

1                        W. Elam

2    to be absent that day?

3         A.    No.

4         Q.    The meeting that you had with

5    Ms. Bowry where she said that Mr. James was now

6    your supervisor, that meeting occurred prior to

7    June 22; correct?

8         A.    Yes.

9         Q.    Prior to receipt of this memo, had

10   Mr. James ever told you that when you're going

11   to be absent that you needed to contact him?

12        A.    No.

13        Q.    Is your testimony that there were

14   never any discussions between you and Mr. James

15   about how contact you -- contact him prior to

16   being absent?

17        A.    No.

18        Q.    Did you have Mr. James' cell phone on

19   June 22 --

20             MS. MUNSKY:  Sorry, strike that.

21        Q.    Did you have Mr. James' cell phone

22   number on June 22, 2015?

23        A.    I don't recall.

24        Q.    Why weren't you at work on June 22,

25   2015 between 9 a.m. and 1:54 p.m.?

Page 147

W. Elam

1

2       A.      I called in, I took a sick day

3   because my wife told me they had moved up her

4   preoperation for surgery.

5           So I called in to dispatch.  When

6   you're sick -- you take a sick day off, that's

7   protocol, to call in and let them know.

8           And then I also called in to Lillian,

9   which was my assistant and told her to make sure

10  she let's Anthony James know that I had to take

11  my wife to -- to her doctor appointment, and if

12  I could finish.  I'm going to come in.

13          But that wasn't protocol.  I was

14  extending that to him.

15      Q.      But on June 22, 2015, he was your

16  supervisor; correct?

17      A.      Yes.

18      Q.      So you said that you called Lillian,

19  who is your assistant, and told her to let

20  Anthony know that you would be absent; right?

21      A.      To let Anthony know.  I said you

22  could let Anthony know that and anybody else

23  know that.

24      Q.      Did you contact Sherill Henry on June

25  22?

Page 149

1                              W. Elam

2      sick day.

3              The procedures was to call in and let

4      them know you're taking a sick day.  That's what

5      I did.

6          Q.    What's the basis for your belief that

7      you didn't have to let your supervisor know that

8      you'd be absent?

9          A.    I'm sick.  That I took a sick day.  I

10     took a sick day, so we never did that.  We just

11     called in.  That was the protocol.

12             And I still did call and leave a

13     message for him because I didn't have his

14     number.  I don't believe I had his number.

15         Q.    Who did you leave a message with?

16         A.    With Lillian Somersle.

17         Q.    Was Lillian Mr. James' assistant?

18         A.    No.

19         Q.    I'm going to show you a document

20     that's marked as D-19.

21             (Defendant's Exhibit D-19, a

22         presurgery testing document, marked for

23         identification, as of this date.)

24         Q.    Have you seen this document before?

25         A.    Yes.

```
 1                         W. Elam
 2        Q.     What is this document?
 3        A.     This is the presurgery testing.
 4        Q.     This is what you were referring to
 5   when you said that your wife had presurgical
 6   testing on June 22, 2015?
 7        A.     Yes.
 8        Q.     When did your wife first receive this
 9   document?
10        A.     Don't recall.
11        Q.     Would it be accurate to state,
12   though, that she receive it to prior to June 22,
13   2015?
14        A.     Pretty much.
15        Q.     So were you aware that she had
16   presurgical testing prior to June 22, 2015?
17        A.     I wasn't -- I don't recall.
18        Q.     Did you notify anyone at Concourse
19   Village prior to June 22 that you would need to
20   be absent on June 22?
21        A.     No, I didn't.  I didn't know I had to
22   be -- I didn't know I had to be there because
23   she usually had an aide, but the aide didn't
24   come in, so I was forced, I had to take her.
25        Q.     Did you ever provide this to anyone
```

Page 178

W. Elam

1

2    supposed to come Friday to look at my computer

3    because it was the day of me supposed to have

4    this report.

5              And then I went to spoke to

6    Ms. Henry, told her that -- she told me she

7    came, another computer, and she said she called

8    the outside contractor which -- oh, excuse me.

9              It could have been Thursday because

10   it could have been -- I'm not sure if it was

11   Thursday, Thursday evening, the computer, or

12   Friday.  I'm not sure.

13        Q.    Prior to June 29, 2015 when you got

14   D-23 for Mr. James, did you ever tell Mr. James

15   that something was wrong with your computer on

16   June 25 or June 26?

17        A.    Yes.

18        Q.    When did you tell Mr. James that

19   something was wrong with your computer?

20        A.    When I gave him the written, the

21   handwriting, the report I gave him, it was

22   handwritten, I said my computer's not working.

23   I said I wrote it out for you.  He said just put

24   it on my desk.

25        Q.    About what time was that on Friday?

Page 221

                              W. Elam

1    targeting you?

2         A.    I believe Mr. James was targeting me

3    because before we had -- before, I never had a

4    problem with him until I took off the time to

5    take my wife to her appointment, and the

6    statement he made after that, telling me that he

7    doesn't really care about my wife being

8    handicapped, so --

9         Q.    And the time that you're referring

10   that you took off, it was -- look at D-18 in the

11   stack?

12        A.    (The witness complies with request.)

13        Q.    So the time that -- to rephrase my

14   question -- the time that you were referring to

15   that you took off to take -- to care for your

16   wife, it was the June 22, 2015 doctor's

17   appointment?

18        A.    Yes.  Actually, that wasn't the first

19   time, though.

20        Q.    What was the -- what was the first

21   time?

22        A.    The first time below was in June

23   11th.  Around that time.

24        Q.    When did you take off?

Page 222

W. Elam

1
2      A.    I didn't take off then, that time
3  was -- he wanted me to -- to work at a night
4  shift, and I told him that I -- it would be hard
5  for me to take a night shift.  I have to take
6  care of my wife.
7           And he told me that -- his statement
8  was that -- let me make sure I say it right.
9  This is a place of business and that things
10  doesn't work around my wife because she's
11  handicapped.
12           And he said that.  So I said well,
13  Concourse Village is aware of this.  He tells me
14  that well, I'm in charge now.
15      Q.    Is that your characterization of what
16  Mr. James said or is that a word-for-word
17  recitation of what Mr. James said?
18      A.    That's pretty much word for word what
19  he said.
20      Q.    Do you know whether other supervisors
21  were being requested to work a night shift?
22      A.    I believe so.  But that wasn't my
23  title when I was hired to work the hours he was
24  trying get me to work.
25      Q.    I thought you said your title was

Page 226

1                        W. Elam

2    no time to tend to my wife.  Exact words.

3        Q.    On June 22, 2015, though, you were

4    given a sick day for caring for your wife;

5    correct?

6        A.    I wasn't given nothing.  I took a

7    sick day.

8        Q.    Right, you were paid for that day

9    off; correct?

10       A.    I have to get paid for a sick day.

11       Q.    Right, but it was to care for your --

12   the reason -- you weren't sick on June 22?

13       A.    No, but I got in trouble, though.

14       Q.    So it's your testimony that this June

15   22, 2015 memo is getting in trouble for taking

16   the sick day, not for failing to notify your

17   supervisor?

18       A.    Well, like I told you at the

19   beginning, our procedure is to call in.  No one

20   said we had to -- I had to call him personally,

21   tell him I'm taking a sick day.

22             I didn't have his number.  I left a

23   message with the dispatch, so I did.

24       Q.    You weren't actually disciplined for

25   taking a sick day; correct?

Page 228

1                        W. Elam

2    did, he said you're not allowed to take off no

3    time, sick time or personal time to attend to

4    your wife.

5         Q.    Did he tell you that you were being

6    disciplined or that this was a verbal warning?

7              MR. RIVERA:  Objection.

8         A.    Well, I don't know what you want to

9    -- I don't know what you call it, but someone

10   telling you that you can't --

11        Q.    No, I'm just asking did he say to you

12   this is a verbal warning?

13             MR. RIVERA:  Objection.  He answered

14        the question.  He told you what he said.

15             MS. MUNSKY:  Okay.

16        Q.    So he didn't say anything else other

17   than what you just testified to?

18        A.    Yes, that I could recall.

19        Q.    Again, you were paid for your sick

20   day on June 22, 2015; correct?

21        A.    I believe so, yes.

22        Q.    Now other than what you've testified

23   to, are there any other examples of Mr. Elam's

24   hostile work environment toward you?

25             MR. RIVERA:  Objection.  He's

Page 231

1                        W. Elam

2      25, any and all material orders for or towards

3      this facility must be approved by me.  Before

4      ordering, a list of all requested items must be

5      brought to me for final authorization."

6                What was your feeling --

7                MS. MUNSKY:  Sorry, strike that.

8           Q.    That was a change in current

9      practice; right?

10          A.    Well, not -- well, the only change it

11     was, was usually I would report to a director,

12     but she was only the supervisor, so I guess

13     that's the only change.

14          Q.    What was your feelings about that

15     change?

16                MR. RIVERA:  Objection.

17          A.    It didn't really bother me.  Like I

18     said, I had 9, 8 -- 7 or -- you know 9 or 8

19     directors -- excuse me, 8 or 9 directors before

20     him, and I had to follow procedures, so it was

21     not a problem.

22          Q.    So as you sit here today looking at

23     D-27 and the sentence that "Mr. James has a

24     personal issue with me due to my initial

25     nonagreement to having the stock X reassigned to

Page 237

1                         W. Elam

2       Q.     Did you call his work number?

3       A.     I remember I (inaudible) but I called

4    the office and told them tell Mr. James that I'm

5    not coming in, I'm sick.

6       Q.     Who did you speak with?

7       A.     I don't recall now.  It's been

8    awhile.

9       Q.     Did you call Mr. James' cell phone?

10      A.     I don't recall.  I could have.  I'm

11   not sure.

12      Q.     Did you tell anyone else at Concourse

13   Village that you were calling out sick on July

14   3rd?

15      A.     No.  I believe I called -- I believe

16   I called Mr. James and I made -- I backed myself

17   up by sending Ms. Henry to let her know also so

18   it won't be a problem, because I felt I had to

19   make sure I covered both tracks.

20            MS. MUNSKY:  Let's take a couple

21       minutes.

22            (Brief recess taken.)

23   FURTHER EXAMINATION

24   BY MS. MUNSKY:

25      Q.     Mr. Elam, in May or June 2015, did

Page 247

1                          W. Elam

2    Mr. James?

3         A.    Yes.

4         Q.    When?

5         A.    I don't recall.

6              MS. MUNSKY:   Let's mark this as D-33.

7              (Defendant's Exhibit D-33, a

8         document, marked for identification, as of

9         this date.)

10        Q.    Have you seen this document before?

11        A.    Yes.

12        Q.    Does it refresh your recollection as

13   to whether you were absent from work the week of

14   the 6th?

15        A.    Yes.

16        Q.    And what days were you absent from

17   work?

18        A.    July 7th.   I don't know -- I don't

19   know if the dates, if the dates or the day July

20   7 was.

21        Q.    Well, it says here, "This patient was

22   seen in this office on July 7.   He may return to

23   work/school on July 10, 2015."

24              So do you know if you worked on July

25   8 and July 9?

Page 251

```
1                       W. Elam
2        A.     Termination document.
3        Q.     And how did you receive this letter?
4        A.     In a meeting with Ms. Bowry, two
5   board members.  Actually it could have been
6   three.  Ms. Henry, myself, security guard.
7        Q.     Did anyone in this meeting say
8   anything to you?
9        A.     What do you mean by that?
10       Q.     Did they just hand you the letter or
11  did they say anything else in the meeting?
12       A.     They just hand me -- she -- Ms. Bowry
13  hand me the letter.
14       Q.     Did she say anything else?
15       A.     That I was terminated, I believe.
16       Q.     Did anyone else say anything in that
17  meeting?
18       A.     Mr. Myers said a few things.
19       Q.     What did Mr. Myers say?
20       A.     He asked her -- tell her -- kept
21  saying that she couldn't -- she couldn't fire me
22  because the board didn't agree with that.
23       Q.     And Mr. Myers said that in the
24  meeting?
25       A.     Yup.  Actually, he kept saying it.
```

Page 261

1                    W. Elam

2      A.     After.

3      Q.     After, okay.   About how many years

4   after?

5      A.     A few years.

6      Q.     So in paragraph 14 it reads,

7   "Mr. Elam, his wife's primary caregiver, assumed

8   responsibility for his wife's health and safety,

9   which includes regularly taking her to doctors'

10  appointments, feeding and bathing her."

11            Who would assist her while you were

12  at work?

13            MR. RIVERA:   Objection.

14            THE WITNESS:   Answer it?

15            MR. RIVERA:   You can answer it, yes.

16     A.     Her aide I pay for.

17     Q.     What's the aide's schedule?

18     A.     It depends because she has a doctor

19  so -- she works sometimes 4 to 5 hours a day

20  depending what time Monica has doctor

21  appointments or therapy, so it changes.

22            She goes to therapy three times a

23  week, so her times are all different.

24     Q.     So what time do you assist your wife?

25     A.     After work.   I usually leave like 2

Page 262

1                              W.  Elam

2      or  3.    It  depends.    Sometimes  a  little  later

3      like  3:30.    It  depends.

4              Q.      In  paragraph  15  it  alleges  that

5      "Concourse  was  fully  aware  of  Mr.  Elam's  wife's

6      severely  comprised  medical  condition  to  wit  of

7      his  association  with  a  person  with  a

8      disability."

9                      Who  was  aware  of  your  wife's  medical

10     condition  at  Concourse  Village?

11             A.      All  the  board  members  that  was  there

12     at  the  time  it  happened,  the  management  company,

13     and  everybody  in  Concourse  Village  that  know  me.

14             Q.      And  would  you  say  that  Ms.  Bowry  was

15     aware  of  your  wife's  medical  condition?

16             A.      At  first,  Ms.  Bowry  wasn't  a  board

17     member  or  anything,  but  she  found  out  once  she

18     became  a  board  member.    So  I'm  quite  sure  she

19     could  have  heard,  she  knew.

20             Q.      Did  Ms.  Henry  know  about  your  wife's

21     medical  condition?

22             A.      Yes.

23             Q.      Did  Anthony  James  know  about  your

24     wife's  medical  condition?

25             A.      I  told  him,  yes.

Page 264

1                           W. Elam
2          Q.     Is it a written policy?
3          A.     I believe so.  It was written when I
4    started work.  They told me and everybody that
5    works there have to take a day, something to
6    attend to their family, you have to take a sick
7    day off.  You don't have a personal day to do
8    that.
9          Q.     You were never denied as an employee
10   of Concourse Village the ability to use a sick
11   day to care for your wife; correct?
12              MR. RIVERA:   Objection.
13         A.     Again, I don't -- that's a sick day,
14   I don't know, how would they deny me for it?
15         Q.     They wouldn't pay you for it.
16         A.     Really at the end of the year, I
17   never use my sick days.  I always had like seven
18   or eight every year, and I always have my
19   vacation till the end of the year.  So I may
20   have got sick once or twice within that time.
21         Q.     So, again, so my question, no one at
22   Concourse Village ever prohibited you from using
23   a sick day to care for your wife?
24         A.     Again, I didn't use a lot of sick
25   days to care for her, but no, they haven't.

Page 268

1                          W. Elam

2              You can answer the question to the

3         extent that you can without revealing any

4         communications that me or any other attorney

5         gave to you.

6         A.    Okay, because he said it out of his

7    own mouth.

8         Q.    What did he say and who is he?

9         A.    Mr. James.

10        Q.    What did he say?

11        A.    He said that he does not care that my

12   wife is disabled and that he's the boss, and

13   that -- that was one of the statements he said.

14   And I told you a couple.

15        Q.    Why else do you believe that

16   Concourse Village discriminated against you due

17   to your association with your disabled wife?

18             MR. RIVERA:   Objection.   It's been

19        asked and answered.

20        Q.    Any other reasons why you believe

21   that Concourse Village has discriminated against

22   you due to your association with your disabled

23   wife?

24        A.    Can you repeat that again?

25             MS. MUNSKY:   Can you repeat that?

1                          W. Elam

2              COURT REPORTER:  "Any other reasons

3       why you believe that Concourse Village has

4       discriminated against you due to your

5       association with your disabled wife?"

6       A.    Well, again, like I said, because he

7    told me this, and afterwards I got written up.

8              And after that, they started

9    harassing me, saying everything -- like every

10   little thing, it seemed like I was getting

11   harassed, attacked, and that's why.  It didn't

12   happen before then.

13      Q.    When did Mr. James start working at

14   Concourse Village?

15      A.    I believe in May.

16      Q.    That would be May 2015?

17      A.    I'm not sure.  2015, I'm not sure if

18   it was May or before then.  I'm not sure.

19      Q.    Other than what you've testified to,

20   is there any other reason --

21              MS. MUNSKY:  Or let me strike that.

22      Q.    Other than what you've testified to,

23   are there any other reasons why you believe

24   Concourse Village has discriminated against you

25   due to your association with your disabled wife?

Page 271

W. Elam

2         So I'm trying to find out what is the

3  basis for your claims against Concourse Village,

4  against Mr. James and against Ms. Bowry.

5         So I've already asked you questions

6  about your claims of discrimination against

7  Concourse Village.

8         So now I'm asking specific claims as

9  to the basis for your belief that Mr. James

10  discriminated against you due to your

11  association with your disabled wife?

12         MR. RIVERA:   Objection.

13     A.     I answered that already.

14     Q.     So is it the same reasons as what you

15  testified to earlier concerning Concourse

16  Village?

17     A.     Well, my thing was Mr. James, like I

18  said, what he said and how he respond.   And

19  Ms. Bowry, she was helping him.

20     Q.     What is the basis for your belief

21  that Ms. Bowry discriminated against you due to

22  your association with your disabled wife?

23         MR. RIVERA:   Objection.

24     A.     Because whatever Mr. James was

25  telling her, she was going along with it.

1                         W. Elam

2        A.    Oh, the write-ups, the way he was --

3   seemed like everything I was trying to -- yeah,

4   the write-ups and the things that was happening.

5        Q.    Why do you believe that he was

6   writing you up?

7        A.    Why do I believe?

8        Q.    Yes.

9        A.    Retaliation from -- I guess because,

10  you know, I don't know.  I guess it's because

11  when I told him about my wife's situation, it

12  seemed like he didn't like it.

13       Q.    Any other reasons?

14             MR. RIVERA:  Objection.

15       A.    I don't know if there's any other

16  reasons.

17       Q.    Why do you believe that Ms. Bowry

18  retaliated against you?

19       A.    Because she was working with Anthony.

20       Q.    Any other reasons why you believe

21  that Ms. Bowry was retaliating against you?

22       A.    Well, also -- what I was told that

23  she was retaliating, she was trying to -- she

24  was, how can I say -- trying to fire me, I

25  believe.

Page 276

                        W. Elam

1

2      Q.      Who told you she was retaliating?

3      A.      Board member.

4      Q.      Which board member?

5      A.      Mr. Myers.

6      Q.      Do you know what the Family and

7  Medical Leave Act is?

8              MR. RIVERA:   Objection.

9      A.      No.

10     Q.      In your complaint, you allege that

11  defendants -- sorry, let me take that back.

12             In your complaint you allege that you

13  requested FMLA leave to care for your wife who

14  suffers from a serious health condition.

15             And then in paragraph 65, "The

16  defendants attempted to prevent plaintiff from

17  using such leave."

18             Did you ever request FMLA leave to

19  care for your wife?

20             MR. RIVERA:   Objection.

21     Q.      And that's leave under the Family and

22  Medical Leave Act.

23     A.      They never brought it to my

24  attention.

25     Q.      Sorry, what?

Page 277

W. Elam

1

2       A.       They never told me about it.

3       Q.       Did you ever ask to take time off to

4   care for your wife and Concourse Village

5   rejected that request?

6               MR. RIVERA:   Objection.

7               MS. MUNSKY:   What is the basis for

8       that objection?

9               MR. RIVERA:   It's a compound

10      question.   There's two parts to that.   Did

11      he ask for leave to care for his wife and

12      then did --

13              MS. MUNSKY:   Fine, okay.

14      A.       So what's the question?

15      Q.       Did you ever make a request to take

16  time off to care for your wife that was denied

17  by Concourse Village?

18      A.       I just worked around -- I worked

19  around it.   That's the best I can do.   All the

20  situations, I worked around it.

21              I didn't want to lose my job.   I

22  didn't know if I was entitled to take time off,

23  how much time I could take off or anything,

24  so --

25      Q.       Did you ever express to anyone at

Page 279

1                        W. Elam

2       A.      Yes.

3       Q.      After that time, did you ever ask

4    anyone --

5               MS. MUNSKY:  Or sorry, strike that.

6       Q.      After 2011 and your conversation with

7    Desi, did you ever communicate with anyone at

8    Concourse Village the need TO take time off to

9    care for your wife?

10      A.      Again, like I said, I just worked

11   around it.  I don't recall exactly what

12   happened.  It was awhile.

13              I WAS going through some stuff and I

14   just tried TO work around IT as best I could.

15      Q.      During the time when Anthony James

16   was at Concourse Village, did you ever ask him

17   TO take time off to care for your wife?

18      A.      Once I told him that I took the time

19   off to care for my wife, he told me I couldn't

20   do it.

21              That's not the procedure of Concourse

22   Village and he told me I couldn't do it.  So how

23   can I ask him when he told me no?

24      Q.      So that was on June 22, 2015; right?

25      A.      June 11, I believe.

Page 282

1                          W. Elam

2          Q.    All right, why did you need to take a

3     day off to care for your wife?

4          A.    I had to take her to some

5     appointments she had to go to.  Doctor

6     appointments and stuff.

7          Q.    And you did that on June 22; correct?

8          A.    That was the day after I got written

9     up that I didn't want to do it no more.

10         Q.    So between July 22 and July 13, what

11    days did you need to take off to care for your

12    wife?

13         A.    I don't recall the days, but there

14    was more days?

15         Q.    How many days?

16         A.    Like three or four more days.

17         Q.    What was the reason for that?

18         A.    I had to take her to a doctor

19    appointment.

20         Q.    It's your testimony that you never

21    asked anyone at Concourse Village whether you

22    could take those days off?

23              MR. RIVERA:  Objection.

24         A.    Again, I told you that once I got

25    written up for taking a day off, I didn't want

Page 285

                                W.  Elam

1

2          there's FMLA versus not, I'm asking

3          specifically about time off.

4          Q.      So why do you believe that defendants

5     attempted to prevent you from using time off to

6     care for your wife?

7          A.      Because when I took the time off, I

8     got written up and suspended.

9          Q.      In paragraph 71 of your complaint, it

10    alleges that "Defendants granted plaintiff FMLA

11    leave to care for his wife who suffers from a

12    serious health condition."

13              Were you granted leave under the

14    Family and Medical Leave Act at Concourse

15    Village?

16         A.      No.

17         Q.      So that statement is false?

18         A.      What statement was that?

19         Q.      "Defendants granted plaintiff FMLA

20    leave to care for his wife who suffers from a

21    serious health condition."

22         A.      Where is that at?

23         Q.      It's in paragraph 71 of your amended

24    complaint.

25              MR. RIVERA:    (Indicating.)