1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - - -x

5   WALTER ELAM,

6            Plaintiff,

7            -against-              15 Civ 7215

8   CONCOURSE VILLAGE, INC., ANTHONY
    JAMES, INDIVIDUALLY, and LETITIA BOWRY,
9   individually,

10           Defendants.

11  - - - - - - - - - - - - - - - - - - - -x

12

13           DEPOSITION of ANTHONY JAMES, taken by

14  Plaintiff pursuant to Notice, held at the

15  offices of The Harman Firm, 220 Fifth Avenue,

16  New York, New York, on Friday, May 20, 2016,

17  commencing at 10:00 a.m., before Margaret M.

18  Harris, a Shorthand (Stenotype) Reporter and

19  Notary Public within and for the State of New

20  York.

21

22

23

24

25

2

A P P E A R A N C E S:

      THE HARMAN FIRM
          Attorneys for Plaintiff
          220 Fifth Avenue
          New York, New York  10001

        BY:  EDGAR RIVERA, ESQ.


      CLIFTON BUDD & DEMARIA, LLP
          Attorneys for Defendants
          350 Fifth Avenue
          New York, New York  10118

        BY:  STEFANIE R. MUNSKY, ESQ.


ALSO PRESENT:

     Walter Elan

MCM REPORTING SERVICE
(516) 775-5209

22

1                          James

2              A      I cannot say, sir.

3              Q      Who gave you the promotion?

4              A      The board of directors.

5              Q      Did you ask for the promotion?

6              A      No, sir.

7              Q      So the board of directors decided

8      on its own to promote you to maintenance

9      director?

10             A      Yes, sir.

11             Q      Did the board give you a reason

12     why they were promoting you?

13             A      I was served with a document

14     where I was promoted.

15             Q      And what did that document say?

16             A      I cannot say verbatim, but it

17     says I was promoted to the responsibility of

18     director of maintenance and I have full

19     supervision of, where I would be actually in

20     change of everything for maintenance at

21     Concourse Village.

22             Q      Was the promotion a surprise?

23             A      No, sir.

24             Q      When did you first find out that

25     you were being promoted?

24

1                          James

2     new lead supervisor?

3              A       Yes, sir, with the directive of

4     the board.

5              Q       Do you intend to hire one?

6              A       Yes, sir.

7              Q       What's the lead supervisor

8     responsible for?

9              A       The day-to-day running of

10    Concourse Village.

11             Q       And what is Concourse Village?

12             A       It's a Mitchell-Lama corp.

13             Q       Is Concourse Village a business?

14             A       I don't understand that question,

15    sir.

16             Q       You testified that the lead

17    supervisor was responsible for the day-to-day

18    running of Concourse Village, correct?

19             A       Yes, sir.

20             Q       And what is the day-to-day

21    running of Concourse Village?

22             A       Ensuring the upkeep, the upkeep,

23    such as cleaning, solving issues reported by

24    tenants or residents.

25             Q       Besides the day-to-day running of

33

1                          James

2              A       Yes, sir.

3              Q       What are those procedures?

4              A       We operate progressive

5      discipline.

6              Q       Is this your policy or Concourse

7      Village's policy?

8              A       It's a general policy.

9              Q       So that's Concourse Village's

10     policy?

11             A       I wouldn't say Concourse

12     Village's policy, it's a general policy that is

13     respected by the unions.

14             Q       So it's a union policy?

15             A       It's part of the union policy.

16             Q       And can you explain the union's

17     progressive discipline policy?

18             A       If someone should violate or do

19     something not in accordance with the rules, you

20     may first speak to them, give them a verbal

21     warning.

22                     The next time you would give them

23     a written warning.  The next time you may give

24     them a written warning with a suspension.

25                     And if it continues, then you can

34

1                         James

2       terminate them, you can write them and terminate

3       them.

4                   Unless it's a crime, such as

5       theft, they can be terminated immediately.

6             Q      So if there is a crime, that's an

7       exception to the progressive disciplinary

8       policy?

9             A      Yes, sir.

10            Q      Are there any other exceptions?

11            A      I cannot recall offhand.

12            Q      And if an employee isn't within

13      an exception, you follow the progressive

14      disciplinary policy?

15            A      Yes, sir.

16            Q      You mentioned that one of the

17      responsibilities of a lead supervisor is

18      updating sick leave and work performance; is

19      that correct?

20            A      Updating?  I didn't say updating.

21            Q      How would you describe that?

22            A      Sick leave updated by management.

23      On their receiving information from my

24      department, they would update the records.

25            Q      If an employee asks for sick

35

                        James

1    leave, what is your next step?

3         A      I have never had an employee ask

4    for sick leave, sir.

5         Q      No employee has ever asked you

6    for sick leave?

7         A      No, sir.

8         Q      Has an employee ever asked you

9    for a day off because he or she was sick?

10        A      I don't understand that question.

11        Q      Has any employee ever been unable

12   to come to work due to an illness?

13        A      Oh, yes, definitely, yes, sir.

14        Q      But that's separate from sick

15   leave?

16        A      Well, if they do have sick leave,

17   most likely they will apply, they would submit

18   an application for the sick leave that they stay

19   home or for the day they stay home on sick

20   leave, if they have.

21        Q      You testified that no employee

22   has asked for sick leave, correct?

23        A      Asked me.  No, they don't ask for

24   sick leave.  They apply for it.

25        Q      They apply for it?

43

1                         James

2    the board.

3            Q      By "we," who are you referring

4    to?

5            A      The board of directors.

6            Q      So is this a discussion between

7    you and the board of directors?

8            A      I was told, the board of

9    directors, we had -- that conversation came up.

10   It was discussed as one of their policies that

11   always has been.

12           Q      You testified that regular

13   supervisors must call the lead or the

14   maintenance director, correct?

15           A      Yes, sir.

16           Q      And you testified that you can't

17   say if that policy is written and that you have

18   never seen it, correct?

19           A      I cannot say if it's written.  I

20   never saw it.

21           Q      How would a supervisor find this

22   policy?

23           A      I cannot say if it was written,

24   sir.

25           Q      Have you ever trained a

51

1                          James

2          A       Under the rule, yes, it would be.

3                  However, I try to have a rapport

4    with my employees.

5          Q       So you have a degree of

6    discretion?

7          A       Yes, sir.

8          Q       On how the rule is applied?

9          A       Yes, sir.

10         Q       Now, for the other situation,

11   where an employee has a sick dependent that is

12   more than just an emergency, that would be the

13   type of situation that would fall under the

14   FMLA; is that correct?

15         A       If it's an ongoing situation,

16   sir.

17         Q       How does an employee find out

18   about the FMLA?

19         A       Management, if they go to

20   management, management will guide them

21   appropriately or accordingly.

22         Q       Do you know of any employee who

23   has gone to management for leave under FMLA?

24         A       Since I'm there, I don't know of

25   any.

55

James-CONFIDENTIAL

1                    James-CONFIDENTIAL

2      can't recall his first name.

3                  But he's about seven months

4      out -- no, about eight months out.

5           Q      And when did his leave start?

6           A      Sick leave?  Sometime last year.

7                  No, about nine months out, he's

8      out.

9           Q      So nine months from today?

10          A      Nine months prior to today.  In

11     excess of nine months, yeah.

12          Q      And you referred Michael Daiz to

13     management, correct?

14          A      I did refer him to management.  I

15     cannot say exactly what transpired.

16          Q      What did he tell you that led you

17     to refer him to management?

18          A      His parents had some medical

19     issues that he wanted some time to deal with.

20     And he had some medical issues, too.

21          Q      Did someone tell you that if

22     somebody asked -- strike that.

23                 Did Concourse direct you to go to

24     management in the situation where an employee

25     comes to you saying that their parents had

67

1                           James

2           Q       Does the lead supervisor have the

3    power to discipline the stockroom supervisor?

4           A       Yes, sir.

5           Q       Does that discipline include

6    termination?

7           A       Yes, sir.

8           Q       Can the lead supervisor terminate

9    the stockroom supervisor or stockroom clerk,

10   when you use those two interchangeably, without

11   authorization?

12          A       I don't understand that question,

13   sir.

14          Q       Sure.  I'll rephrase it.

15                  Does the lead supervisor need

16   authorization from anybody else before they fire

17   a stockroom supervisor?

18          A       Sir, as the lead supervisor, one

19   of the things I always do is to work with

20   management.

21                  I had never taken under my

22   responsibility to act or make certain decisions

23   without informing or discussing what I'm about

24   to do.

25          Q       So when you were the lead

91

1                        James

2          Q      So valid medical reasons is

3    broader than just a genuine illness?

4          A      Yes, sir.

5          Q      And it would include the things

6    that we talked about before, for example --

7    strike that.

8                 It would include a family member

9    who was sick?

10         A      As general reasons.

11         Q      And it would include a family

12   member who needed to go to a doctor so long as

13   the family member needed help?

14         A      Yes, sir.

15         Q      So long as the family member

16   couldn't do it themselves?

17         A      Yes, sir.

18         Q      I asked you this question before.

19                When did you start working with

20   Concourse Village?

21         A      April 20, 2015.

22         Q      And when was the first time that

23   you met Walter Elam, the plaintiff in this

24   action?

25         A      Shortly after.  I cannot recall

97

1                         James

2            Q       And her answer is she didn't

3     know?

4            A       She didn't know.

5            Q       Did you ever find out on June

6     22nd where Walter was?

7            A       Sometime later I heard he -- I

8     was told he went to the hospital.

9            Q       Who did you learn that from?

10           A       I heard it within the workers,

11    the employees.  I just can't remember who told

12    me that at the time.

13           Q       But it wasn't the assistant?

14           A       No.

15           Q       What's the assistant's name, by

16    the way?

17           A       Lillian Somersle.

18           Q       So Lillian never told you where

19    Walter was?

20           A       At that time.

21           Q       Did she ever tell you where

22    Walter was?

23           A       Later that day she told me I

24    think he had a medical appointment or he went to

25    the doctor or something.  Something like that.

99

1                       James

2    a pattern.

3             Q       There is no question.

4                     When did you write that

5    memorandum?

6             A       On the 22nd?

7             Q       Around what time?

8             A       About 3:00.

9             Q       Was that before or after you

10   heard from the employee, who you don't recall,

11   that Walter was dealing with some medical issue?

12            A       I can't recall at that time.

13            Q       Did you send this to Walter, the

14   memorandum?

15            A       I didn't send it to him, sir.

16            Q       This memorandum was never sent to

17   Walter Elam?

18            A       I didn't send it to him, I served

19   him.

20            Q       What's the difference?

21            A       Send means somebody else -- my

22   interpretation is via somebody else as opposed

23   to me serving it to him directly.

24            Q       When did you serve it to him

25   directly?

101

1                        James

2          A       I wrote the memorandum the same

3    day.  The memorandum is June 22nd.

4          Q       But you don't recall when during

5    that day?

6          A       Around 3:00, somewhere around

7    that time.

8          Q       And you learned at some point

9    during that day from Lillian Somersle and

10   another employee that Walter had been dealing

11   with something medical?

12         A       I heard, yes, I heard somewhere

13   around that time.

14         Q       But you are not sure if you

15   learned that before or after you served the

16   memorandum to Walter?

17         A       I cannot definitely remember.  I

18   cannot say right now.

19         Q       What did Walter say to you when

20   you handed him this memorandum, if anything?

21         A       I did not hear his response.

22         Q       I'm sorry?

23         A       I did not hear the response.

24         Q       Why didn't you hear it?

25         A       Because he didn't speak to me, he

102

```
1                           James
2      grumbled something.  He did not speak to me.
3              Q      Did he tell you where he was?
4              A      No, sir.
5              Q      And you are not sure if you knew
6      where he was at the time you handed him the
7      memorandum?
8              A      I am not sure.
9                     MR. RIVERA:  Mark this.
10                    (Document Bates stamped
11                    P000033 was marked as James Exhibit
12                    5 for identification, as of this
13                    date.)
14     BY MR. RIVERA:
15             Q      I'm handing to the witness a
16     document marked P000033 (handing).
17             A      (Perusing document.)
18             Q      This document is dated June 24,
19     2015 and says, "To whom it may concern:  On
20     Monday, June 22, 2015, Mr. James asked me where
21     is your boss.  I told him that he is not coming
22     in today because he had to take his wife to
23     pre-op."
24                    Was that an accurate reading of
25     the document?
```

106

James

2 several, on several reasons.

3    Q    No, just on that occasion for not

4 being at work, did you discipline him?

5    A    I cannot recall.

6        But if there is a document that

7 can refresh me, I will take a look at it and

8 acknowledge if I did.

9    Q    So you don't recall if you

10 disciplined him for not being at work that

11 morning?

12    A    On that one, sir, it is a while

13 now, I cannot remember if I did.

14        If I did, I would have written

15 it, and if written, if you showed me, I will

16 acknowledge if it was me.

17    Q    Do you have a voice mail at the

18 Concourse that you regularly have access to?

19    A    I don't have a voice mail, sir,

20 but I have a phone that all the employees have

21 my number.

22    Q    You testified earlier that if a

23 supervisor is going to be absent for a medical

24 reason that one thing that they can do is call a

25 dispatcher?

107

1                     James

2          A      Yes, sir -- no call dispatcher,

3     call me or dispatcher.

4          Q      Did you speak with the dispatcher

5     on June 22nd?

6          A      I always speak with my

7     dispatcher, sir.

8          Q      So you did speak to the

9     dispatcher on June 22nd?

10         A      I always speak to my dispatcher

11    on a daily basis all the time.  So I'm not sure

12    exactly what you are referring to.

13         Q      Did the dispatcher inform you

14    where Walter was?

15         A      When are you talking about, the

16    22nd?

17         Q      Yes.

18         A      I can't recall.

19         Q      Did you say anything to Walter on

20    June 22nd regarding his wife?

21         A      At that time I didn't even know

22    Mr. Walter was married.

23         Q      You didn't know he was married at

24    that time?

25         A      At that time?  No.

109

1                          James

2          A       It was not as soon as I got

3     there.  It was sometime later.

4          Q       In June?

5          A       I just can't recall, but this had

6     involved the general manager.

7          Q       Who was Sherill Henry at that

8     time?

9          A       Yes, sir.

10                 And because of his resistance on

11    inquiring to him why he didn't want to work the

12    evening, at that stage he told me his wife was

13    ill.

14         Q       So at some point, not in April,

15    but perhaps in June, he told you that his wife

16    was ill?

17         A       Yes, sir.

18         Q       Was that before or after

19    June 22nd?

20         A       I cannot recall the exact time,

21    sir, because when he told me that, I stopped, I

22    eliminated or I did not change his schedule,

23    because I respect family life and I did not want

24    it to have any impact or any adverse effect on

25    his wife.

112

1                           James

2           Q       Is it your testimony that when

3    Walter objected to changing the schedule that it

4    was your decision to allow him to keep working

5    the hours he had already been working?

6           A       Yes, sir.

7           Q       Nobody told you to do that?

8           A       Nobody.

9           Q       Did you allow anybody else to

10   keep their schedule?

11          A       No, sir.

12          Q       He was the only exception to your

13   rule?

14          A       Yes, sir.

15          Q       And, again, why did you make that

16   exception?

17          A       Because he told me that his wife

18   was in a medical state and his wife needed him.

19   And I respect family life.

20          Q       Did you ask any questions about

21   his wife's medical condition?

22          A       No.  He told me that she was,

23   that she was badly injured, I think, that was

24   the word he used, she was seriously injured.

25                  I never tried to inquire into it

114

1                           James

2       just can't recall.  I really, really can't

3       recall.

4                   I didn't take note of, I did not

5       put into writing or anything like that what he

6       had told me, because I thought that was

7       confidential.

8           Q     When you did learn about Walter's

9       wife, did you ever send him to management?

10          A     No, sir.

11          Q     Did you think that what his wife

12      had would warrant sending him to management?

13          A     Well, Mr. Walter was at Concourse

14      Village long before me, and if it was serious I

15      am of the opinion that he would have taken the

16      necessary actions.

17                  I did not see myself getting

18      further involved in it.

19          Q     So am I correct in understanding

20      that because he had been an employee for such a

21      long time you believed he would have already

22      known what to do?

23          A     Yes, sir.

24          Q     And you didn't provide him with

25      anything else?

119

1                        James

2         Q       Do you have any reason to know

3    besides what you have just explained, that

4    Walter had received notice of FMLA from anybody

5    at management?

6         A       I cannot say.

7         Q       And he certainly didn't receive

8    it from you, correct?

9         A       He did not receive it from me,

10   sir.

11        Q       Were there any other instances

12   besides the June 22nd instance where Walter was

13   late or wasn't at work due to his wife?

14        A       I cannot say what it was due to,

15   sir, but there were several days he was late.

16        Q       But you are not certain why he

17   was late those days?

18        A       No, I'm not certain.

19        Q       Did he ever ask you for days off

20   or to be late because of his wife?

21        A       Never, sir.

22        Q       He never did?

23        A       Never did.

24        Q       Do you think Walter had ever been

25   distracted at work because of his wife?

120

                              James

1

2          A       I cannot say, sir.

3          Q       Was it --

4          A       Just one minute.  Let me just

5    correct something.

6                  I think, yes, he did ask me to be

7    about twice.  Yes, he did.

8          Q       Because of his wife?

9          A       No, because he had something to

10   do.

11         Q       Unrelated to his wife?

12         A       I don't know what it was about.

13   I didn't inquire.

14                 Yes, he did.

15         Q       Did you speak to Letitia Bowry

16   about Walter's termination?

17         A       Well, as I indicated before, I

18   spoke to the president and the general manager

19   all the time about performances.

20         Q       And they listened to you when you

21   spoke to them about people whom you supervised

22   performances?

23         A       Yes, sir.

24         Q       Did you make any recommendations

25   about Elam to Bowry?

121

James

2      A      Well, that's part of my job.  I

3  recommend all the time my opinion, and, you

4  know, I speak to, we communicate, we discuss, we

5  analyze, and, as I said, I never do anything

6  singlehandedly, I would always let them know

7  what I'm up to, at least for information sake,

8  maybe not their input, but information sake.

9      Q      Did you recommend his

10  termination?

11      A      Eventually, yes, I did.

12      Q      And you recommended it to Letitia

13  Bowry?

14      A      And the general manager, to

15  everybody.

16      Q      To everybody who would listen?

17      A      Yes, sir.

18      Q      Do you remember what you told

19  Letitia?

20      A      There were a lot of

21  conversations.  I just can't remember the exact

22  wording.

23              But, in effect, that he was not

24  complying on requests, he was not performing, he

25  was not, he doesn't know material names, he

123

                              James

1

2        A        Sir, that's one of the

3   qualifications of a stockroom person.  You must

4   be aware of a spreadsheet.  I'm not supposed to

5   do that.

6        Q        So he was supposed to have known

7   that before he took the job?

8        A        Of course.

9        Q        And so you didn't provide him

10  with any training about that?

11       A        No, I did.

12       Q        Because you didn't think it was

13  necessary?

14       A        As I said, he was in the position

15  over seven years before I got there.

16                And this was quite strange, me

17  requesting a spreadsheet, a database, as to what

18  the stockroom have and what it don't have.

19                He didn't even tell me he didn't

20  have that.

21       Q        Before his termination, you let

22  him know that what he was doing was wrong?

23       A        Well, not in the direct words

24  like that, because I respect people's feelings,

25  but I was trying to train him about the proper

125

                              James

2            So then I start questioning his

3    ability to do the job.

4            Even though I requested what I

5    requested as a spreadsheet, inventory, to date

6    he has not informed me, "Mr. James, I don't have

7    that" or "I don't know that."

8        Q     You wrote him up for not keeping

9    a proper inventory list, correct?

10       A     Yes.

11       Q     Can you explain or describe what

12   happened?

13       A     Early in my employment I

14   requested an inventory from the stockroom, a

15   written, a handwritten list was given to me by

16   the assistant, not Mr. Elam.

17           I requested it again.  This time

18   I didn't get it.  I requested it over a period

19   of time.

20           Eventually I got something

21   handwritten by Mr. Elam.  I informed him this is

22   not what it is supposed to be like.

23       Q     Did you tell him before you

24   received the handwritten inventory list that it

25   needed to be something different?

126

1                           James

2           A      No, sir.

3                  However, if your boss or your

4      supervisor make a request of that, to me it's

5      insulting to give something like that.

6           Q      Had he ever given you an

7      inventory list before?

8           A      No.

9           Q      That was the first time he was

10     giving you an inventory list?

11          A      Yes, sir.  After several

12     requests, something that when I go to the

13     stockroom, the amount of stock was there, one,

14     they were outdated; two, they had no place to be

15     in the stockroom.  The place was like a junk

16     yard.

17                 That's when I start asking

18     questions.  You had a soda machine, you had all

19     kind of stuff that need no place in a stockroom.

20          Q      And you saw that upon your first

21     day at work?

22          A      Not the first day, not the first

23     day.  But upon my inspection.

24          Q      I'm sorry?

25          A      Upon my inspection sometime going

133

1                          James

2          A       No.  And in this document, does

3     not anything says typewritten.

4          Q       It says, "Once again, I am

5     requesting the said document typewritten," so,

6     in fact, it does say that.

7          A       No, before it says, prior.  It

8     didn't say typewritten or handwritten.  The

9     prior request I made never said anything

10    typewritten or handwritten.

11         Q       So the prior request wouldn't be

12    clear whether you wanted it to be typewritten or

13    handwritten or either?

14         A       So if he had a problem, I

15    included, if he had a problem in understanding,

16    I went all the way to specify exactly what I

17    wanted.

18         Q       So you never told Mr. Elam that

19    it was unacceptable because it was handwritten?

20         A       Because of, the relationship has

21    been estranged with Mr. Elam.

22         Q       As early as June 29th?

23         A       Whereby if I tried to speak to

24    him, he would try to record and is hostile

25    measure.

135

1                     James

2          Q      But it wasn't necessary for you

3     to report it?

4          A      I reported it.  I didn't write

5     it.

6          Q      It wasn't necessary for you to

7     memorialize it?

8          A      I wouldn't put it like that.

9     Even though it was like that, I was still trying

10    to have a work relation with him.

11         Q      So you're saying that to keep a

12    work relation with Elam you reported orally but

13    wouldn't go so far as writing to the board that

14    you were having problems supervising him because

15    he was recording conversations?

16                     MS. MUNSKY:  Objection to

17                     form.

18         A      I wouldn't put it like that, sir.

19         Q      How would you put it?

20         A      I would say I didn't see it

21    necessary at the time to write that.

22         Q      Did you ever write it?

23         A      No, I didn't write it.

24         Q      So it never seemed necessary to

25    you to write it?

MCM REPORTING SERVICE
(516) 775-5209